**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| SEAN STEPHENSON, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| PATRICE R. JONES, *individually*, | )   **Case No.:** |
| DAVID LAMAR, *individually*, | ) |
| ANTONIO MCCLAIN, *individually*, | )   **Demand for Jury Trial** |
| MORRIS ROGERS, *individually*, | ) |
| TRAVIS FITZGERALD, *individually,* | ) |
| DR. TAHIR SIDDIQ, *individually*, | ) |
| and | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

Plaintiff Sean Stephenson brings this action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights. Plaintiff seeks compensatory and punitive damages, attorneys' fees, expenses and costs, and any other relief the Court deems appropriate. Plaintiff demands a trial by jury.

### PARTIES

#### *Plaintiff*

1.      Plaintiff Sean Stephenson is a natural person over the age of 21.

#### *Corrections Defendants*

2.      Defendant Patrice R. Jones is a natural person over the age of 21.

3.      From before the events that form the basis of this complaint until on or about September 2023, Defendant Jones was the Warden at Bullock Correctional Facility ("Bullock"). As Warden, Defendant Jones was responsible for the day-to-day operations of Bullock, the safety

and security of all prisoners there, and the supervision of all subordinate employees. Defendant Jones's responsibilities as Warden included ensuring: adequate supervision and monitoring of prisoners; adequate classification of prisoners; appropriate housing assignments for prisoners; adequate staffing levels; appropriate discipline and deterrence of prisoner and staff misconduct; adequate implementation of internal security audits; and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

4.      Defendant David Lamar is a natural person over the age of 21.

5.      At all relevant times, Defendant Lamar was an Assistant Warden at Bullock. As Assistant Warden, Defendant Lamar was responsible for the day-to-day operations of Bullock, the safety of all prisoners there, and the supervision of all subordinate employees and security activities.

6.      Defendant Antonio McClain is a natural person over the age of 21.

7.      At all relevant times, Defendant McClain was an Assistant Warden at Bullock. As Assistant Warden, Defendant McClain was responsible for the day-to-day operations of Bullock, the safety of all prisoners there, and the supervision of all subordinate employees and security activities.

8.      Defendant Morris L. Rogers is a natural person over the age of 21.

9.      At all relevant times, Defendant Rogers was a Correctional Captain at Bullock. As Captain, Defendant Rogers was responsible for the safety of all prisoners at Bullock, security activities, and ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures, including ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband

searches. Defendant Rogers also had the responsibility for ensuring that prisoners were safely housed, and he had the authority to adjust a prisoner's housing assignment.

10.     Defendant Travis J. Fitzpatrick is a natural person over the age of 21.

11.     At all relevant times, Defendant Fitzpatrick was a Correctional Officer at Bullock. As a Correctional Officer, Defendant Fitzpatrick was responsible for the safety and security of prisoners at Bullock and for monitoring and supervising prisoners.

### *Medical Defendants*

12.     Defendant Tahir Siddiq, M.D., is a natural person over the age of 21.

13.     At all relevant times, Dr. Siddiq was an employee and/or agent of Wexford and worked as a physician and as the Medical Director at Bullock. As the Medical Director, Dr. Siddiq was a final policymaker for Wexford in matters related to the provision of medical care at Bullock. As the Medical Director, Dr. Siddiq was responsible for ensuring that all incarcerated individuals at Bullock who needed medical care received it. Dr. Siddiq was also responsible for training and supervising members of Bullock's medical staff to ensure that they provided necessary medical care to all incarcerated individuals at Bullock.

14.     Defendant Wexford Health Sources, Inc. ("Wexford") is a corporate entity licensed to practice business in the State of Alabama.

15.     At all relevant times, Wexford contracted with the Alabama Department of Corrections ("ADOC") to provide medical and mental health care to individuals in the custody of ADOC, including individuals like Plaintiff who were incarcerated at Bullock.

### JURISDICTION AND VENUE

16.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights.

17.     This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

19.     Plaintiff Sean Stephenson has been in the custody of the ADOC since September 2010.

20.     Sean is a 33-year-old nonviolent offender, incarcerated for property and drug crimes.

21.     At the time of the events that form the basis of this complaint, Sean was incarcerated at Bullock, located on Highway 82 East in Union Springs, Alabama 36089.

### *The Widespread History of Violence at Bullock*

22.     Alabama's prison conditions have historically been among the worst in the nation.

23.     In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions of Alabama's prisons for men. The investigation focused on whether prisoners are adequately protected from physical harm and sexual abuse by other prisoners; whether prisoners are adequately protected from excessive force and sexual abuse by correctional officers; and whether Alabama's prisons provide safe, sanitary, and secure living conditions.

24.     The DOJ published the report of its investigation in April 2019. The report concluded that reasonable cause existed to believe that "Alabama routinely violates the constitutional rights of prisoners housed in the Alabama's prisons [sic] by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to

provide safe conditions," and that the violations "are exacerbated by serious deficiencies in staffing and supervision and overcrowding."

25.     The DOJ's investigation "revealed that an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."

26.     The rates of violence, sexual abuse, and prisoner death are especially high at Bullock.

27.     At the time of the DOJ's investigation, Alabama's prisons for men had the highest homicide rate in the country. Its 2017 homicide rate was 56 per 100,000 prisoners—approximately eight times the 2014 national average homicide rate of 7 per 100,000 prisoners.

28.     Since 2019, that homicide rate has gone up.

29.     In 2023, the ADOC reported 15 homicides across all its facilities, which housed approximately 20,000 prisoners. That corresponds to a homicide rate of 75 per 100,000 prisoners—more than ten times the 2014 national average homicide rate and more than twelve times the 2019 national average homicide rate for state prisoners of 6 per 100,000 prisoners.

30.     But Alabama's prisons are not deadly only because of violence.

31.     In 2019, the national average overall mortality rate for state prisoners nationwide was 273 per 100,000 prisoners. In 2023, the ADOC reported 325 total deaths across its prisons—a mortality rate of 1625 per 100,000 prisoners, or nearly six times the 2019 national average.

32.     Drugs and deadly drug overdoses are also common in Alabama's prisons, especially in Bullock. The ADOC reported 111 total deaths from drug overdoses during 2023—a death rate of 555 per 100,000 prisoners. The 2019 national average overdose death rate for state prisoners was 6 per 100,000 prisoners, meaning that Alabama's 2023 drug overdose rate was more than ninety-two times the 2019 national average.

33.     The prevalence of drugs in Alabama's prisons is dangerous for reasons beyond overdoses. Alabama prisoners are "subjected to severe violence related to the [prison] drug trade." Prisoners under the influence of drugs behave violently and erratically toward other prisoners, and drug debts fuel assaults, extortion, and sexual abuse.

34.     Further compounding the risks, Alabama's prisons, especially Bullock, are full of weapons. In 2023, the ADOC reported confiscating 5501 weapons, including eleven firearms. Alabama's total prison population that year was approximately 20,000 people, equating to one weapon confiscated for every 3.6 people.

35.     Sexual assault is also commonplace in Alabama's prisons, especially Bullock. In 2019, the DOJ reported that "[s]exual abuse in Alabama's prisons is severe and widespread, and it is too often undetected or prevented by [Department] staff." And correctional staff do not protect prisoners from sexual assault. After reviewing hundreds of reports, the DOJ "did not identify a single incident in which a correctional officer or other staff member observed or intervened to stop a sexual assault."

36.     Exacerbating all these dangers, Alabama's prisons, including Bullock, are extraordinarily overcrowded.

37.     In 2023, the ADOC reported an average total population of 20,150 people. Those prisoners were housed in facilities designed for 12,115 people, meaning that Alabama's prisons operated in 2023 at 166% of capacity. In 2017, when operating at 167.8% of capacity, Alabama's prisons were the most overcrowded prisons in the country.

38.     Overcrowded prisons can be dangerous for many reasons. Prison overcrowding is associated with higher levels of depression, suicide, violence, and illness.

39.     Alabama, like many states, responded to prison overcrowding by converting common areas into "open dormitories"—large rooms filled with bunk beds packed closely together. These makeshift living arrangements create visibility problems because officers cannot see across the dormitory to monitor all the prisoners. There is also more competition for use of all resources—showers, toilets, phones, recreational equipment, space. These characteristics increase the likelihood that conflicts will erupt between prisoners and decrease the likelihood that officers will be able to effectively respond to those conflicts.

40.     While the population of Alabama's prisons has skyrocketed, their staffing levels have consistently fallen.

41.     The ADOC's staffing problems have been the subject of numerous legislative hearings, lawsuits, and news reports. The ADOC has been under court order for years to increase its staffing levels.

42.     Despite the court order, its staffing levels are not improving.

43.     In fiscal year 2017, the ADOC reported "critical levels of authorized staffing shortages."

44.     In February 2019, it reported that it needed to hire more than 2000 correctional officers and 125 correctional supervisors to adequately staff its men's prisons.

45.     For the quarter ending June 2023, the ADOC reported a correctional staff vacancy rate of 62.50% across its entire prison system. That same quarter, the ADOC reported that only one of its major facilities was staffed at more than 60%. In contrast, four of its major facilities were staffed at less than 30%; three more were staffed at less than 40%; and four more were staffed at less than 50%.

46.    The extreme understaffing means that prisoners are "unsupervised and largely left to their own devises." And the severe overcrowding compounds the Department's supervision problems. Dorms of hundreds of inmates are regularly supervised by one officer. Some dorms are nearly entirely unsupervised, with officers coming into the dorms only to count the prisoners several times a day. Most dorms remain locked, leaving hundreds of prisoners confined in an overcrowded space with no supervision and no reliable way to access help in the case of an emergency. Prisoners injured in fights, sexually assaulted, or who overdosed on drugs often wait hours before they are able to leave the dorms to get help. Seriously injured prisoners have died while locked in dorms without access to medical attention.

47.    The combination of overcrowding and understaffing across Alabama's prisons, including Bullock, "results in prisons that are inadequately supervised, with inappropriate and unsafe housing designations, creating an environment rife with violence, extortion, drugs, and weapons."

48.    Based on their respective positions, responsibilities, and experience, each of the Corrections Defendants was aware of all these conditions at the time of the events that form the basis of this complaint. Each of the Corrections Defendants was also aware that these conditions subjected inmates at Bullock, including Sean, to a substantial risk of serious harm from violence by other inmates. Despite this personal knowledge, each of the Corrections Defendants took no action to minimize the existence of these conditions or the effect these conditions had on inmates at Bullock, like Sean.

### Sean's 2022 Injuries and Denial of Access to Medical Care

49.    From in or around May 2022 until in or around December 2022, Sean was housed in F-dorm at Bullock. At that time, F-dorm was known among correctional staff, including each of

the Corrections Defendants, to be one of the most dangerous dorms in Bullock. Inmate-on-inmate violence, extortion, and rape were common in F-dorm, as were drug use and overdose.

50.    Correctional staff were rarely present in F-dorm. One correctional officer was assigned to the "cube," a small, locked room from which the officer was supposed to supervise the entire dorm. This officer, known as the "cube officer," was not allowed to leave the cube to provide additional supervision within F-dorm or to help inmates experiencing emergencies.

51.    F-dorm, like all of Bullock, was severely overcrowded and the number of beds in F-dorm made it impossible to see all of the dorm from the cube. Additionally, inmates frequently hung clothing and sheets from their beds, further obscuring the view of the dorm from the cube.

52.    Aside from the cube officer, correctional-staff presence in F-dorm was scant. Correctional officers and supervisors came into F-dorm only to conduct the institutional count of inmates or when called by a cube officer to respond to an emergency in the dorm.

53.    The institutional count was typically conducted six times each day and usually took five to ten minutes. Cube officers rarely called for correctional staff to respond to emergencies in the dorm.

54.    As a result, correctional staff other than the cube officer were typically present in F-dorm a total of less than an hour each day. The rest of the time, F-dorm was unsupervised, allowing violence, rape, extortion, and drug use to flourish.

55.    Each of the Corrections Defendants knew of all these circumstances and knew of the associated substantial risk of serious harm to inmates, including Sean. Each of the Corrections Defendants nevertheless took no action to address the lack of supervision in F-dorm.

56.    On or about November 18, 2022, while housed in F-dorm, Sean was badly beaten with a pipe by inmates.

57.     Sean received no medical care for this beating and was left in F-dorm with the individuals who had beaten him.

58.     On or about November 20, 2022, two days after the first beating, Sean was beaten again by inmates. This time, he was beaten in the face with a lock.

59.     As a result of these two beatings, Sean suffered a shattered elbow, a broken tibia, a shattered ankle, and a broken nose.

60.     Each of the dorms in Bullock is separated from Bullock's Healthcare Unit ("HCU") by locked gates that can only be opened by correctional staff. As a result, Sean could not seek medical care on his own; he could only seek medical care if correctional staff allowed it.

61.     After the November 20, 2022 beating, Sean was taken to the HCU. Sean was evaluated by a nurse and told her about the two beatings and the injuries he had suffered. The nurse put tape on a cut on his face and sent him back to F-dorm. The nurse refused to give Sean additional medical treatment.

62.     Because Sean's medical needs had not been addressed, he submitted a sick call request the same day of the second beating. In the sick call request, he described his injuries and asked for medical attention. His sick call request made clear that he had suffered serious injuries and needed significant medical attention.

63.     Despite submitting a sick call request, Sean was not called back to the HCU.

64.     The day of the second beating, Sean called his mother and told her of the beatings, his lack of access to medical care, and that he had not been removed from F-dorm.

65.     On or about November 21, 2022, when Sean still had not received medical care, Sean's mother called Bullock.

10

66.     Bullock has one public phone number by which to receive outside calls—(334) 738-5625. When an individual calls Bullock from an outside number, the call is typically answered by a correctional staff member whose job it is to answer calls and route them to the staff member who will answer the caller's question or address the caller's issue. Individuals outside of Bullock have no way to reach Bullock employees other than by calling Bullock's main number and speaking with the individual who answers the phone.

67.     When Sean's mother called Bullock on November 21, 2022, a correctional staff member answered the phone. Sean's mother told that person that Sean had been badly beaten by other inmates and urgently needed medical attention. Sean's mother asked to have Sean pulled out of F-dorm, taken to the HCU for medical attention, and placed in a dorm or cell where he would be safe.

68.     Instead of investigating Sean's mother's assertions and ensuring Sean received medical care and was placed somewhere safe, the correctional staff member took no action in response to Sean's mother's phone call. She did not personally investigate Sean's medical situation or the risk of harm Sean faced, nor did she inform other correctional staff about Sean's medical situation or risk of harm.

69.     As a result, despite Sean's mother's phone call on November 21, 2022, no correctional staff checked on or spoke with Sean or offered him medical care or placement in a different dorm.

70.     The correctional staff member's actions on November 21, 2022, were consistent with the widespread practice at Bullock to ignore or downplay information given to the correctional staff from family members and other loved ones about inmates' medical needs and risk of harm.

71.     Each of the Corrections Defendants knew of this widespread practice. Defendants Jones, Lamar, McClain, and Rogers each had the ability to address this widespread practice by, among other things, employee discipline and/or training.

72.     Each of the Corrections Defendants also knew that this widespread practice subjected inmates, including Sean, to a substantial risk of serious harm.

73.     Nevertheless, Defendants Jones, Lamar, McClain, and Rogers each have taken no action to address this widespread practice, and instead tacitly condone it through their inaction.

74.     The next day, on or about November 22, 2022, Sean still had not received medical treatment and remained in F-dorm with the inmates who had attacked him.

75.     That day, Sean's mother called Bullock three separate times seeking medical attention and safety for Sean. Each time, Sean's mother spoke with the correctional staff member who answered the phone and told her that Sean had been badly hurt in a beating by other inmates, needed medical attention, and was at risk of future beatings. Each time, the correctional staff member took no action in response to Sean's mother's calls. In response to one of Sean's mother's calls, the correctional staff member told Sean's mother that prison staff had checked on Sean and Sean was in F-dorm. This was a lie; Sean was, in fact, in E-dorm, and nobody had checked on him.

76.     Despite Sean's mother's phone calls, no correctional staff checked on or spoke with Sean or offered him medical care or placement in a different dorm.

77.     Sean was not called to the HCU for medical treatment on November 22, 2022.

78.     The next day, on or about November 23, 2022, Sean still had not received medical treatment. Sean submitted another sick call request describing his injuries and asking for medical attention. This sick call request, like the earlier one, made clear that he had suffered serious injuries and needed significant medical attention.

79.     Sean was not called to the HCU in response to his November 23, 2022 sick call request.

80.     On November 23, 2022, Sean's mother called Bullock four different times seeking medical attention and safety for Sean. Each time, Sean's mother spoke with a correctional staff member and told her that Sean had been badly hurt in a beating by other inmates, needed medical attention, and was at risk of future beatings. Each time, the correctional staff member took no action in response to Sean's mother's calls. The third time Sean's mother called, the correctional staff member hung up on her. The fourth time Sean's mother called, the correctional staff member told Sean's mother: "We don't run a daycare, we run a prison, and if your son had listened to you, he wouldn't be where he is now."

81.     On or about November 27, 2022, Sean was finally called to the HCU and seen by a nurse. He told the nurse about the two beatings and the injuries he suffered. It was apparent from Sean's description of his beatings and from his physical condition that he was seriously injured and needed significant medical care.

82.     Despite knowing of Sean's serious medical needs, the nurse did not treat Sean or send Sean to anyone who would treat him. Instead, the nurse took x-rays of Sean's injuries and gave Sean 800 milligrams of ibuprofen.

83.     The nurse told Sean to return to the HCU the next day.

84.     Upon information and belief, the nurse gave Sean no medical treatment beyond giving him 800 milligrams of ibuprofen and taking x-rays pursuant to a policy, practice, or custom of delaying or denying inmates, including Sean, access to necessary medical treatment in an effort to discourage them from seeking medical treatment in order to minimize costs.

85.     Dr. Siddiq knew of this policy, practice, or custom and knew that it subjected inmates, including Sean, to a substantial risk of serious harm. Dr. Siddiq has the ability to change this policy, practice, or custom by, among other things, employee discipline and/or training. Nevertheless, Dr. Siddiq has taken no action to change this policy, practice, or custom, and instead tacitly condones it through his inaction.

86.     The next day, on or about November 28, 2022, Sean tried to return to the HCU.

87.     Even though Sean had been told to go to the HCU and his serious injuries were obvious, correctional staff would not let Sean out of F-dorm.

88.     On November 29, 2022, after dozens of phone calls, Sean's mother finally spoke with Defendant Jones and told her about Sean's injuries. Defendant Jones told Sean's mother that Sean's beatings had not been reported to her and that she did not know about them.

89.     After speaking with Sean's mother, Defendant Jones went to F-dorm to speak with Sean and investigate his injuries and his beatings.

90.     Defendant Jones had the ability and authority to ensure that Sean was moved to a different dorm or placed in a cell where he would be safe and separated from the individuals who had beaten him, but Defendant Jones nevertheless left Sean in F-dorm.

91.     Defendant Jones also had the ability and authority to ensure that Sean was taken to the HCU and received medical treatment, but Defendant Jones did not take action to ensure that Sean received medical treatment that day.

92.     The next day, on or about November 29, 2022, Dr. Siddiq examined Sean's x-rays and determined that Sean had a shattered elbow, a broken tibia, a shattered ankle, and a broken nose.

93.     Dr. Siddiq had the authority to order that Sean be taken to an outside hospital to have his injuries addressed immediately. Nevertheless, despite knowing that Sean had multiple broken bones and knowing that Sean's bones had been broken nearly two weeks earlier, Dr. Siddiq did not send Sean to an outside hospital that day.

94.     Instead, Dr. Siddiq sent Sean back to F-dorm.

95.     Despite knowing that Sean, having suffered multiple broken bones nearly two weeks earlier and was in significant pain, Dr. Siddiq did not order that Sean receive any pain medication.

96.     Five days later, on or about December 5, 2022, Sean was finally sent to an outside hospital to have his broken bones treated.

97.     Sean had surgery on December 9, 2022. Because of the length of time between when he was injured and when he received medical treatment, the surgeon could not adequately repair Sean's shattered elbow, shattered ankle, or broken nose.

98.     Sean returned to Bullock on December 10, 2022, the day after the surgery.

99.     Sean was obviously in need of significant medical care when he returned to Bullock; he was still seriously injured, and he had multiple incisions from his recent surgery.

100.    Nevertheless, and with no medical justification, Bullock's medical staff refused to house Sean in the infirmary and directed correctional staff to send Sean to population.

101.    Upon information and belief, the medical staff refused to house Sean in the prison infirmary pursuant to a policy, practice, or custom of refusing to house incarcerated individuals, including Sean, in the infirmary, even when it is medically necessary to do so, when the beds in the infirmary are full or close to full.

102.    Upon information and belief, this policy, practice, or custom is well known to Dr. Siddiq. Dr. Siddiq has the ability to change this policy, practice, or custom by, among other things, employee discipline and/or training. Nevertheless, Dr. Siddiq has taken no action to change this policy, practice, or custom, and instead tacitly condones it through his inaction.

103.    When Sean returned to Bullock, he was placed in K-dorm.

104.    Although K-dorm was less dangerous than F-dorm, K-dorm was still known to be dangerous. Inmate-on-inmate violence, extortion, and rape occurred frequently, as did drug use and overdose. Each of the Corrections Defendants knew this.

105.    Like F-dorm, K-dorm had very little correctional-officer presence. An officer was stationed outside K-dorm, but the officer could not see all of K-dorm from his or her station and was not authorized to leave his or her station to provide additional supervision of the dorm. The officer also frequently ignored reports from inmates of violence, danger, drug use, and medical needs.

106.    Like in F-dorm, correctional officers other than the one officer stationed outside the dorm were present in K-dorm only to conduct the institutional count or respond to emergencies in the dorm or to help inmates experiencing emergencies, and correctional officers were therefore typically present in K-dorm for a total of less than an hour each day.

107.    Each of the Corrections Defendants knew of all these circumstances and knew of the associated risk of serious harm to inmates, including Sean. The Corrections Defendants nevertheless took no action to address the lack of supervision in K-dorm and thereby allowed the violence, rape, extortion, and drug use in K-dorm to flourish.

*Sean's 2023 Injuries and Denial of Access to Medical Care*

108.    Approximately a year after his 2022 beatings, on or about November 20, 2023, while still housed in K-dorm at Bullock, Sean was again severely beaten by inmates.

109.    Sean reported the beating to correctional staff, told them that he was in danger if he stayed in K-dorm, and asked to be reassigned to a dorm or cell where he would be safe. Pursuant to a policy, practice, or custom of refusing to help inmates who are perceived to have drug-use problems, correctional staff refused to move Sean out of K-dorm.

110.    Sean also tried to go to the HCU to get medical treatment. Pursuant to the same policy, practice, or custom of refusing to help inmates who are perceived to have drug-use problems, correctional staff refused to let Sean go to the HCU.

111.    The same day he was beaten, after correctional staff refused to allow Sean to go to the HCU, Sean filled out a sick call request describing his injuries and asking for medical attention. Sean's sick call request made clear that he was seriously injured and immediately needed significant medical attention.

112.    Sean was not called to the HCU in response to his November 20, 2023 sick call request.

113.    Sean filled out another sick call request the next day, November 21, 2023, describing his injuries and asking for medical attention.

114.    Sean was not called to the HCU in response to his November 21, 2023 sick call request.

115.    Sean filled out another sick call request the next day, November 22, 2023, describing his injuries and asking for medical attention.

116.    Sean was not called to the HCU in response to his November 22, 2023 sick call request.

117.    On or about November 27, 2023, Sean was finally called to the HCU in response to his multiple sick call requests. Sean was seen by a nurse and described his injuries to the nurse. It was clear from Sean's verbal description of his injuries, the description of his injuries in his sick call requests, and his physical appearance that he was seriously injured and needed immediate medical attention.

118.    The nurse gave Sean ibuprofen and sent him back to K-dorm. The nurse refused to give Sean any additional medical treatment.

119.    Upon information and belief, the nurse refused to give Sean medical treatment beyond ibuprofen pursuant to a policy, practice, or custom of delaying or denying inmates, including Sean, access to necessary medical treatment in an effort to discourage them from seeking medical treatment in order to minimize costs.

120.    Dr. Siddiq knew of this policy, practice, or custom and knew that it subjected inmates, including Sean, to a substantial risk of serious harm. Dr. Siddiq has the ability to change this policy, practice, or custom by, among other things, employee discipline and/or training. Nevertheless, Dr. Siddiq has taken no action to change this policy, practice, or custom, and instead tacitly condones it through his inaction.

121.    On or about December 2, 2023, while still in K-dorm, Sean was assaulted again by inmates. Several inmates sat on the back of Sean's legs while other inmates punched him in the face and burned him in the ears and mouth and the bottom of his feet with wicks.[1]

---

[1] A "wick" is a tightly rolled piece of paper that is lit on fire. Because the paper is rolled so tightly, it burns more slowly than a match.

122.   Two days later, on or about December 4, 2023, Sean reported his December 2 assault to Defendant Fitzpatrick and asked Defendant Fitzpatrick to have him moved to a different dorm and help him get to the HCU.

123.   Defendant Fitzpatrick said he would see what he could do. Defendant Fitzpatrick nevertheless took no action to ensure that Sean either got medical treatment or was moved to a dorm or cell where he would be safe.

124.   On or about December 6, 2023, Sean filled out a sick call request describing his injuries and asking for medical attention. The sick call request made clear that Sean was seriously injured and needed immediate medical attention.

125.   On or about December 7, 2023, Sean was called to the HCU. It was clear from Sean's verbal description of his injuries, the description of his injuries in his sick call requests, and his physical appearance that he was seriously injured and needed immediate medical attention. Medical staff gave Sean ibuprofen, told him they would schedule him for x-rays, and sent him back to K-dorm. Medical staff refused to give Sean any additional medical treatment.

126.   Upon information and belief, medical staff refused to give Sean medical treatment beyond ibuprofen and scheduling him for x-rays pursuant to a policy, practice, or custom of delaying or denying inmates, including Sean, access to necessary medical treatment in an effort to discourage them from seeking medical treatment in order to minimize costs.

127.   Dr. Siddiq knew of this policy, practice, or custom and knew that it subjected inmates, including Sean, to a substantial risk of serious harm. Dr. Siddiq has the ability to change this policy, practice, or custom by, among other things, employee discipline and/or training. Nevertheless, Dr. Siddiq has taken no action to change this policy, practice, or custom, and instead tacitly condones it through his inaction.

128.    On or about December 12, 2023, Sean received x-rays of his arm.

129.    Dr. Siddiq read Sean's x-rays the next day, on December 13, 2023, and determined that Sean's arm was broken.

130.    Although Dr. Siddiq knew that Sean's arm had been broken on November 20, 2023, more than three weeks before his x-rays were read, and that Sean therefore likely needed specialty care to address the break, Dr. Siddiq refused to send Sean to an outside doctor for medical treatment. Instead, Dr. Siddiq put Sean's arm in a splint and wrapped it with an Ace bandage and sent Sean back to K-dorm.

131.    Upon information and belief, Dr. Siddiq refused to send Sean to an outside doctor for medical treatment pursuant to a policy, practice, or custom of refusing to seek off-site medical care for incarcerated individuals, including Sean, even when off-site medical care is necessary to provide medical treatment for serious injuries, in order to minimize costs.

132.    At approximately 12:15 a.m. on or about December 29, 2023, inmates poured boiling water on Sean. As a result, Sean suffered third-degree burns on nearly thirty percent of his body.[2]

133.    Sean was taken to the HCU that night and sent to the trauma center at University of Alabama Birmingham ("UAB") to receive treatment for his burns.

134.    Sean returned to Bullock from UAB on or about January 4, 2023.

## COUNT I
**Violation of the Eighth Amendment – Defendants Jones, Lamar, McClain, and Rogers**
*Failure to Protect from a Known Risk of Serious Harm*

135.    Plaintiff incorporates by reference paragraphs 1 through 134 of this complaint.

---

[2] Third-degree burns are the most severe kind of burns; they affect all layers of skin.

136.    Defendants Jones, Lamar, McClain, and Rogers were each responsible for ensuring the safety of all prisoners at Bullock, including Plaintiff.

137.    The conditions at Bullock, including the pervasive and normalized culture of violence, chronic understaffing, corruption, lack of inmate supervision, and ready access to weapons and contraband, posed a substantial risk of serious harm from inmate-on-inmate violence to all inmates at Bullock, including Plaintiff.

138.    These conditions and the resulting risk of serious harm have been well-documented and widely known for years, including in the years before the events that form the basis of this complaint. The risk of harm is also readily apparent to any individual inside Bullock.

139.    Defendants Jones, Lamar, McClain, and Rogers each have known about this substantial risk of serious harm to every inmate at Bullock, including to Plaintiff.

140.    Defendants Jones, Lamar, McClain, and Rogers, by virtue of their position, each had the ability and authority to address the conditions that led to the substantial risk of serious harm.

141.    Nevertheless, Defendants Jones, Lamar, McClain, and Rogers each failed to take reasonable action to address these conditions. For example, Defendants Jones, Lamar, McClain, and Rogers failed to enact, enforce, and/or follow reasonable policies and procedures designed to provide adequate security and supervision at Bullock; failed to discipline and/or train correctional staff when correctional staff failed to provide adequate security and supervision at Bullock; failed to address known security deficiencies, such as lack of intercoms, operative security cameras, and mirrors; and exacerbated the risk and condoned the conduct and conditions creating this substantial risk of serious harm at Bullock.

142.    Defendants Jones, Lamar, McClain, and Rogers's deliberate indifference to Plaintiff's substantial risk of serious harm from inmate-on-inmate violence resulted in inmate being assaulted numerous times, as described above. These assaults caused Plaintiff significant pain and suffering and resulted in him experiencing a lasting disability and permanent disfigurement.

### COUNT II
**Violation of the Eighth Amendment – Defendants Jones, Lamar, McClain, and Rogers**
***Denial of or Delay in Access to Medical Care***

143.    Plaintiff incorporates by reference paragraphs 1 through 21 and 49 through 134 of this complaint.

144.    Defendants Jones, Lamar, McClain, and Rogers were each responsible for ensuring that Plaintiff had access to minimally adequate medical care while he was incarcerated at Bullock.

145.    As described above, members of Bullock's correctional staff denied Plaintiff medical care and/or delayed his access to medical care pursuant to policies, practices, or customs that were widespread, pervasive, and known to Defendants Jones, Lamar, McClain, and Rogers.

146.    Defendants Jones, Lamar, McClain, and Rogers each knew that these policies subjected inmates at Bullock, including Plaintiff, to a substantial risk of serious harm.

147.    Defendants Jones, Lamar, McClain, and Rogers each had the ability to change these policies, practices, or customs by, among other things, employee discipline and/or training.

148.    Nevertheless, Defendants Jones, Lamar, McClain, and Rogers each took no action to change these policies, practices, or customs.

149.    Defendants Jones, Lamar, McClain, and Rogers's failure to change the policies, practices, or customs resulted in significant delay in Plaintiff's access to medical care. This delay

caused Plaintiff significant pain and suffering and resulted in him experiencing a lasting disability and permanent disfigurement.

## COUNT III
### Violation of the Eighth Amendment – Defendant Fitzpatrick
*Denial of or Delay in Access to Medical Care*

150.    Plaintiff incorporates by reference paragraphs 1 through 21 and 108 through 134 of this complaint.

151.    As a Correctional Officer, Defendant Fitzpatrick was responsible for ensuring that Plaintiff had access to minimally adequate medical care while he was incarcerated at Bullock.

152.    As described above, Defendant Fitzpatrick knew that Plaintiff had a serious medical need that required medical attention.

153.    As described above, Defendant Fitzpatrick took no action to ensure that Plaintiff received medical attention for his serious medical need.

154.    Defendant Fitzpatrick's actions resulted in a delay of Plaintiff's access to medical care. This delay caused Plaintiff significant pain and suffering and resulted in him experiencing a lasting disability and permanent disfigurement.

## COUNT IV
### Violation of the Eighth Amendment – Dr. Tahir Siddiq
*Denial of or Delay in Access to Medical Care*

155.    Plaintiff incorporates by reference paragraphs 1 through 21 and 49 through 134 of this complaint.

156.    Dr. Siddiq was responsible for providing Plaintiff with minimally adequate medical care while he was incarcerated at Bullock, either by personally providing Plaintiff medical care or by ensuring that another member of the medical staff provided Plaintiff medical care.

157.    As a physician and the Medical Director at Bullock, Dr. Siddiq had the ability and responsibility to ensure that members of Bullock's medical staff provided Plaintiff with necessary medical care. Despite knowing of Plaintiff's serious medical needs, Dr. Siddiq failed to take any action to ensure that Plaintiff received necessary medical care. At times, as described above, Dr. Siddiq himself denied Plaintiff medical care or delayed Plaintiff's access to medical care

158.    Dr. Siddiq's refusal to treat Plaintiff's serious medical needs and/or to ensure that other members of Bullock's medical staff treated Plaintiff's medical needs caused Plaintiff significant pain and suffering and resulted in him experiencing a lasting disability and permanent disfigurement.

**<u>COUNT V</u>**
**Violation of the Eighth Amendment – Wexford Health Sources, Inc.**
*Denial of or Delay in Access to Medical Care*

159.    Plaintiff incorporates by reference paragraphs 11 through 21 and 49 through 134 of this complaint.

160.    Dr. Siddiq was a policymaker for Wexford in matters relating to the provision of medical care at Bullock.

161.    Wexford, on its own or through the final policymaking decisions of Dr. Siddiq, had a policy, practice, or custom of delaying or denying incarcerated individuals, including Plaintiff, access to necessary medical care in order to minimize costs.

162.    Wexford, on its own or through the final policymaking decisions of Dr. Siddiq, had a policy, practice, or custom of delaying or denying incarcerated individuals, including Plaintiff, access to necessary medical care in an effort to discourage incarcerated individuals, including Plaintiff, from seeking medical treatment, in order to minimize costs.

163.    Wexford, on its own or through the final policymaking decisions of Dr. Siddiq, had a policy, practice, or custom of refusing to house incarcerated individuals, including Plaintiff, in the infirmary, even when it is medically necessary to do so, when the beds in the infirmary are full or close to full.

164.    Wexford, on its own or through the final policymaking decisions of Dr. Siddiq, had a policy, practice, or custom of refusing to send incarcerated individuals, including Plaintiff, off-site to receive medical care, even when that care is necessary to provide medical treatment for serious injuries, in order to minimize costs.

165.    Pursuant to these policies, Dr. Siddiq and/or other Wexford medical staff failed to treat Plaintiff's serious injuries.

166.    Pursuant to these policies, Dr. Siddiq and/or other Wexford medical staff refused to treat Plaintiff's severe pain except for with intermittent ibuprofen, which Dr. Siddiq and/or other Wexford medical staff knew was not sufficient to treat Plaintiff's pain.

167.    Plaintiff's failure to receive necessary medical care caused him significant pain and suffering and resulted in him experiencing a lasting disability and permanent disfigurement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against all the defendants, jointly and severally, and also order as follows:

a.   Find in favor of Plaintiff on all counts;

b.   Award compensatory damages to Plaintiff, against all defendants, in an amount to be determined at trial;

c.   Award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial;

d.  Award Plaintiff recovery of attorneys' fees and other costs; and

e.  Award any other relief the Court deems appropriate.

Respectfully submitted this 20th of November 2024.

*/s/ Susanne Emily Cordner*

Susanne Emily Cordner
(ASB-4687-C61N)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*
